**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**NORTH BREVARD COUNTY HOSPITAL**
**DISTRICT d/b/a PARRISH MEDICAL**
**CENTER,**

                                         **Plaintiff,**

        **v.**                                                        **1:20-cv-363**

**C.R. BARD, INC.; BARD ACCESS**
**SYSTEMS, INC.,**

                                         **Defendants.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


                        **DECISION and ORDER**

**I.      INTRODUCTION**

        Plaintiff North Brevard County Hospital District d/b/a Parrish Medical Center

("Parrish" or "Plaintiff"), individually and on behalf of a putative class of direct purchasers

of peripherally inserted central catheters, commenced this action against Defendants C.R.

Bard, Inc. ("C.R. Bard") and Bard Access Systems, Inc. ("BAS")(collectively "Bard" or

"Defendants").  Plaintiff brings suit under Sections 4 and 16 of the Clayton Act, 15 U.S.C.

§§ 15, 26, to recover treble damages, injunctive relief, costs of suit, and reasonable

attorneys' fees arising from Defendants' alleged violations of Sections 1 and 2 of the

Sherman Act, 28 U.S.C. §§ 1, 2.  *See* Compl., Dkt. No. 1.

        Previously, the Court denied without prejudice to renewal Defendants' motion

1

pursuant to 28 U.S.C. § 1404(a) to transfer this action to the United States District Court

for District of Utah.  *See* 03/24/2021 Dec. & Ord., Dkt. No. 28; *N. Brevard Cty. Hosp. Dist.*

*v. C.R. Bard, Inc.*, No. 1:20-CV-363, 2021 WL 6197267 (N.D.N.Y. Mar. 24, 2021)

("Previous Decision").  Familiarity with this decision is presumed.  Defendants' have

renewed their motion to transfer this action to the District of Utah.  Dkt. No. 34.  For the

reasons that follow, the motion is granted.

## II.  BACKGROUND

### a.  The Complaint

On behalf of itself and a putative nationwide class of direct purchasers of

peripherally inserted central catheters ("PICCs"),[1] Parrish brings claims under Sherman

Act Sections 1 (tying) and 2 (monopolization).  It alleges that Bard unlawfully tied sales of

its PICCs to those of its Tip Location Systems ("TLSs"), technology that enables medical

clinicians to precisely thread a PICC through a patient's veins and ensure that its final

location in the body is correct.  *See* Dkt. No. 1 ¶¶ 1, 80.  Bard's TLSs are sold under the

brand names Sherlock 3CG® Tip Confirmation System and Sherlock® II Tip Location

System (collectively "Sherlock TLS systems").  *Id.* ¶ 7.

Plaintiff's central claim in this action is that Bard unlawfully tied sales of its PICCs to

those of its Sherlock TLS systems, causing Plaintiff and similarly situated purchasers to

pay supracompetitive prices for Bard's PICCs. *Id.* ¶¶ 1, 7–8, 80.  In particular, Plaintiff

---

[1]"A PICC is a central venous catheter placed into a peripheral vein, usually the basilic vein in the arm, and passed to the distal superior vena cava, near the junction of the right atrium of the heart. Clinicians use PICCs to administer fluids, medications, and nutrients; to sample blood; and to power-inject contrast media. The PICC is a thin, soft, flexible tube. The PICC may remain in place for an extended period if no complications arise." Compl. ¶ 3.

alleges that Bard's TLSs work only with a proprietary stylet (a wire that resides within the PICC during placement), and that Bard refuses to sell that stylet "single-sterile," instead selling it only preloaded into its PICCs. *Id.* ¶¶ 35, 40.  Parrish contends that Bard's policy of not selling its stylets standalone but rather only preloaded in its PICCs (the "TLS Policy") forced purchasers into buying Bard's PICCs in order to be able to use Bard's market-leading TLSs, excluded competitors from a segment of the PICC market, and drove up Brad's PICC prices to supracompetitive levels. *Id.* ¶¶ 48, 54.

Parrish alleges that Bard's conduct has denied hospitals the choice of PICCs superior to Bard's PICCs in the suppression of dangerous blood clotting. *Id.* ¶ 2.  It asserts that Bard competitor AngioDynamics, Inc. ("AngioDynamics") sells a PICC that uses superior innovative technology with a significant positive impact on patient outcomes with respect to blood clotting. *Id.*  In *AngioDynamics, Inc. v. C.R. Bard, Inc.*, Civ. No. 1:17-CV-0598 (BKS/CFH)(N.D.N.Y 2017) ("*AngioDynamics*"), filed in this District, AngioDynamics alleges that Bard has violated Section 1 of the Sherman Act, harming competition in the relevant market and causing injury to AngioDynamics. *Id.*

Parrish contends that Bard developed and implemented the TLS Policy without any "legitimate business or other reason," but instead "for the sole purpose of eliminating competition in the sale of PICCs." *Id.* ¶ 46; *see id.* ¶ 10 ("Bard has no legitimate business or health reason to tie its market-leading tip-location systems to its PICCs.").  Parrish contends that "Bard obtained FDA approval to sell its proprietary stylet allowing use of its systems separately from its PICCs, in 'single-sterile' style, which would allow its systems to be used with any company's PICCs." *Id.* ¶ 10.  Parrish asserts that "Bard has sold the

stylet in ['single-sterile' style] to . . . the Cleveland Clinic, allowing the Clinic to use a Bard tip-location system and AngioDynamics' BioFlo PICCs together," but "Bard has not made this option available to any other purchaser, and Bard requires any purchaser interested in acquiring and using its systems to purchase and use Bard's PICCs." *Id.*   Parrish contends that it suffered antitrust injury when it purchased PICCs from Bard, as did other direct purchasers of PICCs across the country. *Id.* ¶ 76.

### b.  Notice of Related Cases

Parrish filed a Notice of Related Cases seeking to relate this putative class action complaint to *AngioDynamics*.  Dkt. No. 16.  The Hon. Brenda K. Sannes, who presides over *AngioDynamics*, found that the two cases are not related under this District's rules. *See* Dkt. No. 19 (text order denying Notice of Related Case and finding that this action and *AngioDynamics* are not related); *see also* NDNY Gen. Ord. 12 (G)(2);[2] (G)(3).[3]

### c.  The Parties

#### 1.  Parrish

Parrish is a governmental entity located in Titusville, Florida. Dkt. No. 1 at  ¶ 16. According to its website, Parrish operates medical facilities in the Cape Canaveral, Indian Harbour Beach, Melbourne, Port St. John, Rockledge, and Titusville communities in Brevard County, Florida.  Defs. Mem. L.  in Supp. of Transfer, Dkt. No. 25-1, n. 4;[4] *see*

---

[2]("A civil case is 'related' to another civil case for purposes of this guideline when, because of the similarity of facts and legal issues or because the cases arise from the same transactions or events, a substantial saving of judicial resources is likely to result from assigning the cases to the same Judge and Magistrate Judge.")

[3]("A civil case shall not be deemed related to another civil case merely because the civil case: (a) involves similar legal issues, or (b) involves the same parties.")

[4]Both sides rely, in part, on their submissions on the previous motion.

*Commander v. Am. Cruise Lines, Inc.*, 389 F. Supp. 3d 180, 184 (N.D.N.Y. 2019)("In deciding a motion to transfer, a court may consider material outside of the pleadings.")(citation omitted).  Those communities are all in the Middle District of Florida. *Id.* at n. 5.  Defendants point out that Parrish did not bring suit in the Middle District of Florida, and admits that it brought suit here because the *AngioDynamics* case involved, *inter alia*, a favorable ruling on a Rule 12(b)(6) motion on a Sherman Act unlawfully tying claim against Bard.  *See* Pltf. Mem. L. in Opp., Dkt. No. 26, at 1,[5] 15.[6]

### 2.  BAS

Defendants assert that BAS is a Utah company with its principal place of business in Salt Lake City, Utah.  Dkt. No. 25-1, at 3  (citing Yodice 06/05/20 Decl., Dkt. No. 25-11, ¶ 4).  Bard contends that its employees: (i) invented, designed, and marketed its PICC and TLS technology and (ii) developed and implemented the TLS Policy at its corporate headquarters in Salt Lake City. *Id.* (citing Blaber Decl., Dkt. No. 25-2, ¶¶ 2, 4(b)–(d); Powers Decl., Dkt. No. 25-8, ¶¶ 5(a), 7; Burnside Decl., Dkt. No. 25-3, ¶¶ 3(a), 6). Defendants assert that BAS sells and distributes PICC and TLS technology nationwide from its Salt Lake City headquarters. *Id.* (citing Blaber Decl., Dkt. No. 25-2, ¶ 2).

### 3.  C.R. Bard

---

[5]("Parrish brought suit in this District because the Court had resolved a motion to dismiss and a slew of discovery motions in a case involving the same core antitrust misconduct at issue in this case – namely, unlawfully tying its sales of peripherally inserted central catheters ("PICCs") to its sales of so-called tip-location systems. (*See* Ex. 1, Complaint, *AngioDynamics, Inc. v. C.R. Bard, Inc.*, No. 1:17-cv-00598-BKS-CFH (N.D.N.Y. May 30, 2017).) Parrish had in mind the obvious efficiencies in the same Court overseeing the legal and factual arguments regarding both cases.")

[6]("Parrish brought suit here because the Court had already resolved a motion to dismiss and a slew of discovery motions in a case involving the core antitrust misconduct at issue in this case. Parrish had in mind the obvious efficiencies in the same Court overseeing the legal and factual arguments regarding both cases. And Parrish and its counsel had indeed concluded that this District was correct in its analysis of the *AngioDynamics* complaint and its denial of Bard's motion to dismiss it.")

C.R. Bard, BAS' parent, is a New Jersey company with its principal place of business in Franklin Lakes, New Jersey. Dkt. No. 25-1, at 3 (citing Yodice 06/05/20 Decl., Dkt. No. 25-11, ¶ 4). Since 2006, C.R. Bard has maintained an office at 605 North 5600 West, Salt Lake City, Utah, 84116, which it shares with BAS. Defs. Mem. L . in Supp. Renewed Motion, Dkt. No. 34-1, at 8 (citing Yodice 04/19/21 Decl., Dkt. No. 34-2, ¶ 5). Defendants maintain that Bard markets, sells, and distributes its PICC and TLS technology out of this shared Utah office. *Id.* at 7 (citing Blaber Decl., Dkt. No. 25-2, ¶ 2). From June 2015 to July 2019, C.R. Bard also maintained a separate finance center located at 4750 West 2100 South, Salt Lake City, Utah, 84120. *See* Yodice 04/19/21 Decl. ¶ 6.

Defendants' authorized representative, Elizabeth Yodice, indicates that in each year between 2016 and 2020, inclusive, C.R. Bard had between 450 and 600 employees in Utah, and in 2020, C.R. Bard had approximately 484 Utah employees. Yodice 04/19/21 Decl. ¶ 7. Ms. Yodice also indicates that "C.R. Bard has been actively registered to do business in Utah since April 14, 2009, and it has had an appointed registered agent for service of process in the State of Utah since that date." Yodice 04/19/21 Decl. ¶ 4. A copy of C.R. Bard's Utah business registration is attached to Ms. Yodice's April 19, 2021 Declaration as Exhibit 1. *See* Yodice 04/19/21 Decl., Ex. 1. Plaintiff contends that this exhibit only shows C.R. Bard's business license was renewed on April 27, 2020, one month after Parrish filed its Complaint, and argues that there is no affirmative statement or evidence that C.R. Bard's business license was valid on March 31, 2020. Plaintiff also supplies evidence indicating that C.R. Bard's business registration in Utah was delinquent as of May 12, 2021 for "failure to file renewal." Dkt. No. 58-2.

6

Plaintiff argues that the evidence in this matter indicates that C.R. Bard is winding down its operations in Utah.  In this regard, Plaintiff notes that in 2017, Becton Dickinson & Company ("Becton Dickinson") acquired C.R. Bard, that most of Defendants' declarants in support of the transfer motion were former C.R. Bard employees prior to the acquisition and are now employed by Becton Dickinson, and that C.R. Bard closed its Utah finance center in 2019.  Plaintiff also asserts that C.R. Bard decreased its labor force by approximately 20% between 2016 and 2020, and has provided evidence indicating that on May 18, 2021, C.R. Bard's LinkedIn page indicated that there were no job openings at that time. Dkt. No. 58-3.  Plaintiff also points to the delinquent Utah business registration.

On the instant motion, Defendants contend that "Plaintiff's alleged injury—mainly that it paid supracompetitive prices for Bard's PICCs because of Bard's allegedly unlawful tying—stems from the alleged decisions of C.R. Bard's employees in Utah to design, market, and sell the Sherlock TLSs so as to be preloaded into Bard's PICCs." Defs. Mem. L . in Supp. Renewed Motion, Dkt. No. 34-1, at 7 (citing Powers Decl., Dkt. No. 25-8, ¶¶ 1, 4, 5(a), 7; Burnside Decl., Dkt. No. 25-3, ¶¶ 1, 2, 3(a), 6; Blaber Decl., Dkt. No. 25-2, ¶¶ 1, 2, 4(b)–(d), 6).  In this regard, Defendants indicate that "[t]he 'primary inventors' of Bard's Sherlock TLS systems—Ed Burnside and Kelly Powers—developed those systems in their capacities as employees of C.R. Bard (not BAS) in Utah." *Id*. at 8 (citing Burnside Decl. ¶¶ 1–2; Powers Decl. ¶¶ 1, 4).  Defendants argue that as the inventors of Bard's TLS systems, Burnside and Powers "played central roles in designing the architecture of those systems, including the proprietary stylet, which they designed 'to be preloaded and incorporated into Bard PICCs.'" *Id.* (quoting Burnside Decl. ¶ 3(a); Powers Decl. ¶ 5(a)). Defendants point to evidence indicating that "David Blaber, formerly the Senior Vice

President of Sales and Marketing at C. R. Bard (and now the Vice President of Sales at Becton Dickinson and Company, C. R. Bard's parent), is and was responsible for the marketing and sales of all Bard PICCs and the Sherlock TLSs." *Id.* (citing Blaber Decl. ¶¶ 1–2). Defendants contend that in this capacity, Blaber has knowledge of the safety, training, liability, business, and marketing reasons for selling the Sherlock-compatible stylet only preloaded into Bard PICCs. *Id.* (citing Blaber Decl. ¶ 4(b)–(d)). Defendants maintain that working in their capacities as employees of C. R. Bard, "Burnside, Powers, and Blaber directed their conduct at (and from) C. R. Bard's and BAS's shared office in Utah." *Id.* (citing Powers Decl. ¶ 7; Burnside Decl. ¶ 6; Blaber Decl. ¶ 6); *see* Blaber Decl. ¶ 7 ("I live in Draper, Utah, and work at Bard Access Systems's office at 605 N 5600 W, Salt Lake City, UT 84116. I have worked out of that office at all times relevant to the allegations in the above-captioned case.").

Ms. Yodice indicates that:

> C. R. Bard employees were responsible for thousands of dollars, and in some instances hundreds of thousands of dollars in sales of 3CG PICC-TLS products to Utah customers during periods relevant to the allegations in this matter. For example, in April 2017 alone, C.R. Bard employees were responsible for more than $100,000 in sales of 3CG PICC-TLS products to Utah customers.

Yodice 04/19/21 Decl. ¶ 8.

## III.   DISCUSSION

### a.  Standard - 28 U.S.C. § 1404(a)

Section 1404(a) of Title 28 of the United States Code allows a district court to transfer a civil action to any other district where the action might have been brought "[f]or the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a).

8

"The objectives of § 1404(a) are 'to prevent the waste of time, energy and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense.'" *Huntley v. Sprout Foods, Inc.*, No. 3:21-CV-00488 (JAM), 2022 WL 138015, at *2 (D. Conn. Jan. 14, 2022)(quoting *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964)); *see Andrews v. A.C. Roman & Assocs., Inc.*, 914 F. Supp. 2d 230, 237 (N.D.N.Y. 2012)(same).  "When considering whether to transfer a case, a district court must conduct a two-part test: (1) whether the action to be transferred might have been brought in the transferee venue; and (2) whether the balance of convenience and justice favors transfer." *View 360 Sols. LLC v. Google, Inc.*, No. 1:12-CV-1352 (GTS/TWD), 2013 WL 12130430, at *4 (N.D.N.Y. Aug. 13, 2013)(internal quotation marks omitted).

**b.  "Might Have Been Brought"**

"To establish that an action might have been brought in the transferee venue, the moving party must establish that (a) venue is proper in the transferee venue; and (b) the transferee venue had personal jurisdiction over the defendant on the date the action was commenced." *Id.*  at *2.  As indicated in the Previous Decision, Plaintiff does not challenge Defendants' contentions that venue would have been proper under 28 U.S.C. § 1391(b)(2) in the U.S. District Court for the District of Utah, and that the U.S. District Court for the District of Utah had personal jurisdiction over BAS because it is organized under Utah law and maintains its principal place of business in Salt Lake City. *See N. Brevard Cty. Hosp. Dist.*, 2021 WL 6197267, at *3.  Thus, the threshold question now is whether the U.S. District Court for the District of Utah had personal jurisdiction over C. R. Bard on the date the action was commenced.  For the reasons that follow, Defendants have established

9

that it did.

### 1.  15 U.S.C. § 22

As indicated in the Previous Decision, there is a Circuit split over the proper interpretation of the venue and process provisions of Section 12 of the Clayton Act, 15 U.S.C. § 22.[7]  *See N. Brevard Cty. Hosp. Dist.*, 2021 WL 6197267, at *4.  Under the "integrated whole" reading of § 22 adopted by the D.C., Second, and Seventh Circuits, venue must be proper before nationwide service of process may proceed. *See Van Ornum v. Am. Med. Ass'n*, No. 2:14-CV-921-RJS-EJF, 2017 WL 9481020, at *6 (D. Utah Mar. 16, 2017), *report and recommendation adopted*, 2017 WL 4339653 (D. Utah Sept. 29, 2017). Under the "independent" reading of § 22 adopted by the Third and Ninth Circuits, nationwide service of process is allowed without requiring proper venue under § 22, thus resulting in nationwide personal jurisdiction over any defendant that has sufficient contacts anywhere within the United States. *See id.*   The District of Utah adopted the "independent" reading of § 22 in *Van Ornum,* but this Court denied without prejudice to renewal Defendants' initial motion to transfer "because there [was] an arguable question whether the District of Utah would have personal jurisdiction over C.R. Bard in that another District Judge in the District of Utah could reach a conclusion different than in *Van Ornum* and apply the 'integrated whole' reading of 15 U.S.C. § 22 . . . ." *N. Brevard Cty. Hosp.*

---

[7]Section 12 of the Clayton Act provides:

Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22.

*Dist.,* 2021 WL 6197267  at *4.  In discussing this issue, the Court indicated that it had "drawn no conclusion as to whether *Van Ornum* would control if the case is transferred to the District of Utah," but also indicated that "in light of the Circuit split and the lack of Tenth Circuit authority on the relevant issue, there is an arguable question whether the District of Utah would have had personal jurisdiction over C.R. Bard on the date the action was commenced." *Id.* at *7.  The Court held that "[f]or this reason, and because Defendants raised their 15 U.S.C. § 22 service of process/personal jurisdiction arguments in their reply," the motion to transfer was denied with leave to renew.  *Id.*  The Court indicated that "[o]n a renewed motion, the parties will have a fuller ability to address this threshold issue." *Id.*

Bard argues now that a court in the District of Utah is likely to follow *Van Ornum*, but contends that even if it did not it would still have exercised personal jurisdiction over C.R. Bard under the "integrated whole" approach to Section 12.  In this regard, Bard argues that because C.R. Bard transacted business in the District of Utah at the relevant time, the split among the circuits on the interpretation of Section 12 is immaterial.  The Court agrees.

Under the "integrated whole" approach, personal jurisdiction is proper when there is venue over the defendant(s) under Section 12—*i.e.*, where the defendant is "an inhabitant" or "may be found or transacts business" in the jurisdiction. 15 U.S.C. § 22*; see, e.g., KM Enters., Inc. v. Glob. Traffic Techs., Inc.*, 725 F.3d 718, 730 (7th Cir. 2013).  By adding the "transacts business" language to Section 12, Congress intended to expand the scope of venue under the antitrust laws. *See United States v. Scophony Corp. of Am.*, 333

11

U.S. 795, 806–07 (1948).  Under Section 12's venue provision, venue is proper as to a corporate defendant if, "in the ordinary and usual sense, it 'transacts business' [in that judicial district] of any substantial character." *Eastman Kodak Co. of N.Y. v. S. Photo Materials Co.*, 273 U.S. 359, 373 (1927).  The test is the "practical, everyday business or commercial concept of doing or carrying on business of any substantial character . . . ." *Scophony*, 333 U.S. at 807; *see Daniel v. Am. Bd. of Emergency Med.,* 428 F.3d 408, 429 (2d Cir. 2005)(The "determination of whether a defendant transacted business in a district depended on a realistic assessment of the nature of the defendant's business and of whether its contacts with the venue district could fairly be said to evidence the 'practical, everyday business or commercial concept of doing business or carrying on business of any substantial character.'")(quoting *Scophony*, 333 U.S. at 807); *Bd. of Cnty. Comm'rs of Custer Cnty. v. Wilshire Oil Co. of Texas*, 523 F.2d 125, 128 (10th Cir. 1975)("[I]n determining whether a corporation is transacting business within a district, practical business conceptions are to be considered rather than hair-splitting legal technicalities. It is not a lawyer's contest.")(citing *Scophony*, 333 U.S. at 808).  For a party to transact business of a "'substantial character' there must be 'some amount of business continuity and certainly more than a few isolated and peripheral contacts with the particular judicial district.'" *In re SSA Bonds Antitrust Litig*., 420 F. Supp. 3d 219, 230 (S.D.N.Y. 2019)(quoting *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 197 (S.D.N.Y. 2018)).  The "nature and amount of a defendant's contacts in a judicial district are to be 'considered in light of the nature of [the defendant's] business.'" *Dennis*, 343 F. Supp. 3d at 199 (quoting *Daniel*, 428 F.3d at 430).  In the Tenth Circuit, the business transacted in

the forum need not relate to the plaintiff's claims. *See Wilshire Oil*, 523 F.2d at 132 (assessing Clayton Act claim, and explaining that it is not "necessary that the claim arise from the very business that was being transacted in order to have proper venue").

As Defendants concede, "for transfer to be proper, the District of Utah must have been able to exercise personal jurisdiction over C.R. Bard on the date Parrish filed its complaint" on March 31, 2020.  Defs. Reply Brief, at 3 (citing *View 360 Sols.*, 2013 WL 998379, at *2).  But, as Defendants point out, in the Tenth Circuit the relevant time for assessing Section 12 venue is "the period when the action arose rather than the date of filing." *Wilshire Oil*, 523 F.2d at 132.  Thus, as Defendants argue, if Parrish had sued Bard in the District of Utah on March 31, 2020, and if the court applied the "integrated" approach, the personal jurisdiction analysis under Section 12 would have assessed whether venue was proper by determining whether C.R. Bard transacted business of a substantial character in Utah at the time the action arose.

Defendants contend that C.R. Bard was transacting business of a substantial character in Utah when this action arose, and that this action arose out of those contacts. Parrish counters that although C.R. Bard maintains an office in Utah, "no current C.R. Bard employee or executive makes any allegations of any specific activity by" that office. Parrish Br., Dkt. No. 58, at 8.  However, C.R. Bard has provided sufficient evidence of its maintenance of an office in Utah, of the activities conducted at that office including that its employees invented and marketed the devices at issue in this case, and other indications of its transaction of business.  *See* Powers Decl. ¶¶ 1, 4, 5(a), 7; Burnside Decl. ¶¶ 1, 2, 3(a), 6; Blaber Decl. ¶¶ 1, 2, 4(b)-(d), 6.  Parrish correctly notes that most of the

13

declarations that Bard submitted in support of its initial transfer motion are from former C.R. Bard employees prior to when Becton Dickinson acquired C.R. Bard in 2017, and are now employed by Becton Dickinson.  But, the pertinent determination considers whether C.R. Bard was transacting business in Utah when the claims in this action arose.  The declarations indicated that the declarants were working for C.R. Bard in Utah when the subject devices were designed and sold, providing support to Defendants' contention that C.R. Bard was transacting relevant business in Utah.

There is also no merit to Parrish's argument C.R. Bard's Utah workforce deserves no weight in the analysis because Bard does not "assert that these '484 Utah employees' conducted C.R. Bard's business in Utah." Parrish Br. at 8.  To the contrary, C.R. Bard's evidence shows that it employed hundreds of individuals who worked in Utah, including in inventing and marketing the Sherlock TLS systems.  *See* Yodice 04/19/21 Decl. ¶ 7; Powers Decl. ¶¶ 1, 4, 5(a), 7; Burnside Decl. ¶¶ 1, 2, 3(a), 6; Blaber Decl. ¶¶ 1, 2, 4(b)-(d), 6.  Furthermore, Defendants' evidence indicates that "C.R. Bard employees were responsible for thousands of dollars, and in some instances hundreds of thousands of dollars in sales of 3CG PICC-TLS products to Utah customers during periods relevant to the allegations in this matter."  Yodice 04/19/21 Decl. ¶ 8.  Tenth Circuit law is clear that it is not "necessary that the claim arise from the very business that was being transacted in order to have proper venue," *Wilshire Oil*, 523 F.2d at 132, and Supreme Court precedent makes clear that Section 12 venue is proper if the corporate defendant transacts business in the forum "of any substantial character." *Eastman Kodak Co. of N.Y. v. S. Photo Materials Co.*, 273 U.S. 359, 373 (1927).  C.R. Bard's continuous presence in Utah since

2006, its employees' invention and sale of the subject devices, and its employees' sales of 3CG PICC-TLS products to Utah customers during periods relevant to the allegations in this matter meet the "of any substantial character" threshold.

There is also no merit to Parrish's argument that C.R. Bard cannot be deemed to "transact business" in Utah because it is winding up its Utah operations. Parrish Br. at 6-7. Defendants convincingly argue that C.R. Bard is not "winding up" its business in Utah, and that "the reduction of C.R. Bard's labor force following its merger with Becton Dickinson hardly demonstrates that fact. C.R. Bard continues to maintain a substantial sales force in Utah and earn substantial revenues from Utah sales during the period 2016-2020." Defs. Reply Br., Dkt. No. 64, at 5 (citing Yodice 04/19/21 Decl. ¶¶ 7, 8). Further, Defendants correctly argue that even if C.R. Bard is winding up its Utah business in the future, the relevant Section 12 venue inquiry looks to business transacted at the time the claim arose, not during some speculative future event. *See Wilshire Oil*, 523 F.2d at 132.

When considering the totality of the circumstances speaking to C.R. Bard's transaction of business in the District of Utah, *see Cascade Steel Rolling Mills, Inc. v. C. Itoh & Co. (Am.) Inc.*, 499 F. Supp. 829, 834 (D. Or. 1980) (explaining that Section 12's transacting-business inquiry requires consideration of "the totality of a defendant's conduct," and noting that the Supreme Court's *Scophony* precedent "precludes separate findings on whether each of plaintiff's factual allegations constitutes transacting business for venue purposes"), Bard has satisfied its burden of demonstrating that C.R. Bard was transacting business of a substantial character in Utah at the relevant time. Therefore, under the "integrated whole" approach to Section 12, the District of Utah would have had

personal jurisdiction over C.R. Bard as of March 31, 2020.

Furthermore, inasmuch as C.R. Bard seeks to transfer this case to the District of

Utah for its convenience because it transacts significant business there and it is where its

relevant potential witness are located, C.R. Bard's contacts with Utah are more than

sufficient to satisfy any Fifth Amendment due process concerns. *See Van Ornum*, 2017

WL 9481020, at *6;[8] *see also Klein v. Cornelius*, 786 F.3d 1310, 1318 (10th Cir. 2015)("To

defeat federal jurisdiction, a defendant must establish that the 'chosen forum will make

litigation ... gravely difficult and inconvenient' or, in other words, the forum district burdens

the defendant with 'constitutionally significant inconvenience.'")(quoting *Peay v. BellSouth

Med. Assistance Plan*, 205 F.3d 1206, 1212 (10th Cir. 2000));  *Peay,* 205 F.3d at 1212

("We emphasize that it is only in highly unusual cases that inconvenience will rise to a

level of constitutional concern.")(internal quotation marks and citation omitted).

## 2.  Utah's Long-Arm Statute

Defendants assert that even if personal jurisdiction could not have been obtained

under Section 12, the District of Utah could have exercised specific personal jurisdiction

---

[8]Judge Furse wrote in *Van Ornum* that "[w]here a plaintiff brings a federal question under a statute providing nationwide service of process,

> the Fifth Amendment requires the plaintiff's choice of forum to be fair and reasonable to the defendant." To defeat federal jurisdiction, *a defendant* must establish that the "chosen forum will make litigation ... gravely difficult and inconvenient" or, in other words, the forum district burdens the defendant with "constitutionally significant inconvenience." We look to non-exclusive factors in considering whether defendants have met this burden, such as (1) the extent of contact with the forum state, (2) the inconvenience of having to litigate in a foreign jurisdiction, (3) judicial economy, (4) the probable situs of the discovery proceedings, and (5) the nature of the defendant's activities and its impact beyond his state's borders.

2017 WL 9481020, at *6 (quoting *Klein v. Cornelius*, 786 F.3d 1310, 1318 (10th Cir. 2015), in turn quoting *Peay v. BellSouth Med. Assistance Plan*, 205 F.3d 1206, 1212 (10th Cir. 2000))(emphasis added in *Van Ornum*).

over C.R. Bard under Utah's long-arm statute.[9]  The Court agrees.

   "Determining specific jurisdiction involves a two-part inquiry: First, do [the plaintiff's] claims arise from one of the activities listed in the statute? And second, are defendant's contacts with this forum sufficient to satisfy the Due Process Clause of the Fourteenth Amendment if the trial court exercises jurisdiction?" *Gardner v. SPX Corp.*, 272 P.3d 175, 179 (Utah Ct. App. 2012)(internal quotation marks and citations omitted).  "If [the long-arm statute] does not permit jurisdiction, then the inquiry is ended; if it does, then the question is whether the statute's reach comports with due process." *Id.* at 179  (internal quotation marks and citations omitted); *see Pro Axess, Inc. v. Orlux Distribution, Inc*., 428 F.3d 1270, 1276 (10th Cir. 2005)("[T]he evaluation of specific jurisdiction in Utah mandates a three-part inquiry: (1) the defendant's acts or contacts must implicate Utah under the Utah long-arm statute; (2) a 'nexus' must exist between the plaintiff's claims and the defendant's acts or contacts; and (3) application of the Utah long-arm statute must satisfy the requirements of federal due process.").

   Utah's long-arm statute permits its courts to exercise specific personal jurisdiction as to "any claim arising out of or related to: (1) the transaction of any business within this state, or . . . (3) the causing of any injury within this state whether tortious or by breach of warranty."  Utah Code § 78B-3-205(1), (3).  Under this statute, "a nonresident may become subject to the jurisdiction of Utah courts by transacting business or causing injury within the state." *Gardner*, 272 P.3d at 179; *see also Bristol-Myers Squibb Co. v. Superior*

---

[9]In the Previous Decision the Court did not limit a renewed motion to only whether personal jurisdiction could be obtained under Section 12, and Plaintiff has not provided authority for the proposition that a party may not raise an argument on a renewed motion that it did not raise in its initial motion.

17

*Court of California*, 137 S. Ct. 1773, 1780 (2017)(For specific jurisdiction, "the suit must arise out of or relate to the defendant's contacts with the forum.  In other words, there must be an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.")(interior quotation marks and citations omitted).

Plaintiff argues that Bard has not made a "clear and convincing" showing that any of C.R. Bard's contacts with Utah give rise to Parrish's claims.  In this regard, Plaintiff contends that its claims against C.R. Bard are based on its decision to tie its TLS systems to its PICCs, but maintains that "Bard has not provided any affidavits or declarations from any C.R. Bard employees or executives stating that the decision to tie the products together was made in Utah. Nor has Bard made a sufficient showing that any of the alleged C.R. Bard contacts with Utah are related to any of Parrish's claims against C.R. Bard."  Dkt. No. 58  at 10-11 (citing *Arguello v. Indus. Woodworking Mach. Co.*, 838 P.2d 1120, 1124 (Utah 1992) (when "the contacts of the out-of-state defendant are unrelated to plaintiff's claims, [then] the claim cannot be said to 'arise out of' the contacts with the state").  Plaintiff maintains that "[t]he design of the architecture of the TLS system or marketing the Bard PICCS and TLS-system is distinct from making the decision to tie the[] products together."  *Id.* at 11.  Plaintiff contends that "[o]n this record, any C.R. Bard contacts with Utah are not 'sufficient – or even relevant' for purposes of specific jurisdiction." *Id.* (citing *Bristol-Myers Squibb*, 137 S. Ct. at 1780).  The Court disagrees.

Plaintiff's allegations in this matter plainly arise out of C.R. Bard's activities in Utah. As Defendants point out, "[t]he 'primary inventors' of Bard's Sherlock TLS systems—Ed

Burnside and Kelly Powers—developed those systems in their capacities as employees of C.R. Bard (not BAS) in Utah." Dkt. 34-1 at 8 (citing Burnside Decl. ¶¶ 1–2; Powers Decl. ¶¶ 1, 4). Although Plaintiff argues that "[t]he design of the architecture of the TLS system or marketing the Bard PICCS and TLS-system is distinct from making the decision to tie [the] products together," various declarations of Bard employees make clear that the Sherlock TLS systems were designed to be preloaded and incorporated into Bard PICCs, and that these design decisions were made by C.R. Bard employees in Utah. *See* Burnside Decl. ¶ 3(a); Powers Decl. ¶ 5(a). Moreover, the head of C.R. Bard's sales, who oversaw the company's policy of selling the stylet only preloaded in its PICCs, David Blaber, is a longtime Utah employee, and the relevant sales were made from Bard's Utah office. Blaber Decl. ¶¶ 1, 2, 4(c). Thus, the evidence clearly indicates that the decisions to tie the products together, and to market the Sherlock TLS systems preloaded and incorporated into Bard PICCs, were made by C.R. Bard employees in Utah. Parrish's claims arise out of the decisions made and policies implemented by C.R. Bard employees in Utah. Thus, Plaintiff's claims arise out of or relate to Defendants' contacts with the District of Utah, thereby satisfying the first question in the two-part specific jurisdiction inquiry.

Furthermore, the Utah Supreme Court has held that "any set of circumstances that satisfies due process will also satisfy the long-arm statute." *SII MegaDiamond, Inc. v. Am. Superabrasives Corp.*, 969 P.2d 430, 433 (Utah 1998). As indicated above, the evidence indicates that C.R. Bard had been actively registered to do business in Utah at least from 2009 to May 12, 2021; since 2006, C.R. Bard has maintained an office at 605 North 5600 West, Salt Lake City, Utah, 84116, which it shares with BAS; in each year between 2016

19

and 2020, inclusive, C.R. Bard had between 450 and 600 employees in Utah, and in 2020,

C.R. Bard had approximately 484 Utah employees; that during periods relevant to

Plaintiff's allegations, C.R. Bard employees were responsible for thousands of dollars of

sales to Utah customers—including, for instance, more than $100,000 in sales of 3CG

PICC-TLS products to Utah customers in April 2017 alone; and that Plaintiff's claims arise

out of C.R. Bard's contacts with Utah.  C.R. Bard's contacts with Utah satisfies the due

process minimum contacts test for specific personal jurisdiction in that C.R. Bard has

purposefully directed its activities at residents of Utah, and Plaintiff's injuries arise out of

the Defendants' forum-related activities. *See Dental Dynamics, LLC v. Jolly Dental Grp.,*

*LLC*, 946 F.3d 1223, 1229 (10th Cir. 2020)("The minimum contacts test for specific

personal jurisdiction has two requirements: (1) a defendant must have purposefully

directed its activities at residents of the forum state, and (2) the plaintiff's injuries must

arise out of the defendant's forum-related activities.")(internal quotation marks and citation

omitted).  Likewise, under the circumstances presented here, exercise of specific personal

jurisdiction over C.R. Bard would not offend traditional notions of fair play and substantial

justice. *See id.* (To determine whether exercising personal jurisdiction would offend

traditional notions of fair play and substantial justice, a court considers "the following

factors: (1) the burden on the defendant; (2) the forum state's interest in resolving the

dispute; (3) the plaintiff's interest in receiving convenient and effective relief; (4) the

interstate judicial system's interest in obtaining the most efficient resolution of

controversies, and (5) the shared interest of the several states in furthering fundamental

social policies.")(citations omitted).  As indicated, C.R. Bard seeks to transfer this action to

the District of Utah for its and its witnesses' convenience.  Also, the dispute involves the

ability of medical providers throughout the United States, including in Utah, to utilize important medical device components in ways not currently available, an issue that Utah and the several states would have an interest in resolving.  Finally, resolution of the case in the District of Utah would provide an efficient resolution of the dispute.  C.R. Bard's contacts with Utah are sufficient to satisfy the Due Process Clause of the Fourteenth Amendment.  Consequently, the District of Utah could have exercised specific personal jurisdiction over C.R. Bard under Utah's long-arm statute.

### 3.  Conclusion - "Might Have Been Brought"

For the reasons discussed here, Bard has established that this case might have been brought in the District of Utah.

### c.  "whether the balance of convenience and justice favors transfer"

"Once it has been established that the action might have been brought in the transferee district, the resolution of a motion to transfer venue lies within the broad discretion of the district court and [is] determined upon notions of convenience and fairness on a case-by-case basis."  *View 360 Sols.,* 2013 WL 12130430, at *4 (internal quotation marks omitted).  "The moving party has the burden of demonstrating the desirability of transfer, and a court should not disturb a plaintiff's choice of forum unless Defendants make a clear and convincing showing that the balance of convenience favors [their] choice."  *View 360 Sols. LLC v. Google, Inc.*, No. 1:12-CV-1352 (GTS/TWD), 2013 WL 998379, at *1 (N.D.N.Y. Mar. 13, 2013), *aff'd*, 2013 WL 12130430 (N.D.N.Y. Aug. 13, 2013)(internal quotation marks and citation omitted).

In considering whether transfer would promote convenience and justice, district

courts have "broad discretion," and consider transfer requests "on a case-by-case basis."

*D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 106 (2d Cir. 2006); *see Red Bull*

*Associates v. Best Western Int'l*, 862 F.2d 963, 967 (2d Cir. 1988)("Section 1404(a)

reposes considerable discretion in the district court to adjudicate motions for transfer

according to an individualized, case-by-case consideration of convenience and fairness.")

(internal citation omitted).   Courts often weigh the following factors in exercising this

discretion: (1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the

location of relevant documents and relative ease of access to sources of proof, (4) the

convenience of the parties, (5) the locus of operative facts, (6) the availability of process to

compel the attendance of unwilling witnesses, and (7) the relative means of the parties.

*D.H. Blair & Co.*, 462 F.3d at 106–07.   There is no strict formula for the application of

these factors, and no single factor is determinative. *Ward v. Stewart*, 133 F. Supp. 3d 455,

460 (N.D.N.Y. 2015).   "In addition to these factors, courts specifically consider judicial

economy and the interests of justice i[n] deciding transfer motions." *Campbell v.*

*Synchrony Bank*, No. 1:17-CV-80 (MAD/DJS), 2018 WL 8731545, at *3 (N.D.N.Y. Sept.

13, 2018)(citations omitted).

### (1) the plaintiff's choice of forum

In general, the plaintiff's choice of forum is "entitled to substantial consideration." *In*

*re Warwick*, 70 F.3d 736, 741 (2d Cir. 1995).   However, Parrish does not operate in the

Northern District of New York, and therefore deference to its choice of forum is reduced.

*See Ventricelli v. Nicklin*, No. 19-cv-0230-GTS-DJS, 2020 WL 132334, at *12 (N.D.N.Y.

Jan. 13, 2020)(deference is reduced where the plaintiff's choice of forum is not its home

forum).  Furthermore, the operative facts underlying Plaintiff's claims did not arise in this District, but rather appear to have arisen in the District of Utah.  *See* Discussion, III(c)(5), *infra*.  "The true locus of operative facts is doubly important in this case because it informs the deference the Court must assign to the plaintiff's choice of forum."  *Huntley*, 2022 WL 138015, at *3.  Parrish's "choice of forum is given less weight where the case's operative facts have little connection to the chosen forum and where, as here, the plaintiff seeks to represent a nationwide class."  *Id.*; *see In re Warwick*, 70 F.3d at 741 ("the plaintiff's choice of forum is a less significant consideration in a ... class action than in an individual action."); *see also Plastic Suppliers, Inc. v. Cenveo, Inc.*, No. 3:10-cv-0512-TJM-DEP, 2011 WL 196887, at *3 (N.D.N.Y. Jan. 20, 2011)("Where the operative facts  of the case have little connection with the district where the suit is pending, the importance of the plaintiff's forum choice as a factor is considerably lessened."); *see, e.g, Horanzy v. Vemma Nutrition Co.*, 87 F. Supp. 3d 341, 349 (N.D.N.Y. 2015)(holding that the locus of operative events supported transfer where putative class challenged conduct that originated from defendants' headquarters).  Any class in this case would "undoubtedly involve class plaintiffs and/or opt-in plaintiffs from outside the Northern District," a fact that further diminishes Parrish's forum choice.  *Andrews*, 914 F. Supp. 2d at 238; *cf. id.* (holding that forum choice supported transfer where all class members' claims, including non-residents', "implicate[d] the decisions of [the defendant's] personnel operating from the [defendant's home] office" in the transferee district).

Moreover, Plaintiff's contention that it chose this District because it "had in mind the obvious efficiencies in the same Court overseeing the legal and factual arguments

regarding both [*AngioDynamics* and the instant case]," *see* Pltf. Mem. L. in Opp., Dkt. No. 26, at 1, 15, fails to weigh against transfer.   Although courts recognize that the existence of a related action in a district is a strong factor to be weighed with regard to judicial economy, saving the parties and witnesses unnecessary expenses, and avoiding inconsistent results, *see Campbell v. Synchrony Bank,* No. 1:17-CV-80 (MAD/DJS), 2018 WL 8731545, at *3 (N.D.N.Y. Sept. 13, 2018)(and cases cited thereat), Parrish's application to deem the cases "related" was denied.   Moreover, *AngioDynamics* concerns one of Bard's competitors - not a purchaser of PICCs.   The instant case, by contrast, concerns a different set of plaintiffs - putative classes of medical provider-purchasers of Bard's PICCs, *see* Dkt. No. 85,[10] - and includes a Sherman Act Section 2 claim not asserted in *AngioDynamics*.   While the two cases both raise Sherman Act Section 1 tying claims against Bard, the cases are not related and the decisions in *AngioDynamics* do not control in this action.   As Plaintiff recognizes, a district court in the District of Utah would not be required to apply *Van Ornum* if the case is transferred there.   *See* Dkt. No. 58 at 4. The same consideration applies to Judge Sannes's decisions in *AngioDynamics*.   Those decisions are not controlling, and a judge in the District of Utah or the undersigned (if the case is not transferred) will need to apply the relevant law to the allegations in the instant *case* - resulting in little judicial economy or savings of time and expense for the parties and witnesses.   Further, "[f]ederal courts are presumed to be equally familiar with federal law." *Wilson v. DirectBuy, Inc.*, 821 F. Supp.2d 510, 518 (D. Conn. 2011).   Thus, there is no

---

[10](seeking to certify classes pursuant to Fed. R. Civ. P. 23(b)(2) and (3) of "U.S. direct purchasers from Bard of its peripherally inserted central catheters ("PICCs") on or after March 31, 2016. Purchasers include in part hospitals, hospital systems, and clinics.")

benefit in terms of applying the applicable law by maintaining the case here.  While there might be inconsistent determinations in the two cases on the Sherman Section 1 tying claims, that possibility will exist whether or not the case is transferred.

There is also no judicial economy or savings of time and expense for the parties and witnesses arising from the discovery determinations in *AngioDynamics*.  While the Hon. Christian F. Hummel, United States Magistrate Judge, presides over discovery in *AngioDynamics* and in the instant case, discovery in *AngioDynamics* is complete and the case is now a trial ready.  In the instant case, by contrast, Bard has moved to stay discovery until its § 1404(a) transfer motion and/or its motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) are decided, *see* Dkt. No. 56, and there appears to have been no substantive discovery determinations made in this case.  Furthermore, despite that Judge Hummel is involved in both cases, the two cases involve different plaintiffs and the instant case involves a claim not asserted in *AngioDynamics*.  A judge in the District of Utah is as capable as Judge Hummel in applying the relevant law to any discovery disputes that might arise in *this* case.  And there is little risk of inconsistent determinations because the discovery disputes in this case, to the extent they arise, will be between different parties and involve different claims and legal theories.

The fact that *AngioDynamics* is pending in this District provides little reason to deny transfer.

In addition, Defendants argue that Plaintiff's selection of this District is classic forum shopping, seeking to ride on the coattails of the *AngioDynamics* 12(b)(6) decision.  There is some merit to this argument, which would weigh in favor of transfer. *See Torres v. S.S. Rosario*, 125 F. Supp. 496, 497 (S.D.N.Y. 1954) (explaining that 28 U.S.C. § 1404(a) was

"designed to remedy the evils of forum shopping"); *Polaroid Corp. v. Casselman*, 213 F. Supp. 379, 383 (S.D.N.Y. 1962) (holding that a plaintiff's choice of forum is entitled to "no weight whatever where it appears that the plaintiff was forum shopping and that the selected forum has little or no connection with the parties or the subject matter"). Plaintiff argues, however, that Bard is the one engaging in forum shopping by seeking to transfer the case out of this District to avoid the *AngioDynamics* Rule 12(b)(6) decision that is adverse to Bard's interests here. In making this argument, Parrish notes that Bard did not move to transfer the *AngioDynamics* case, and that C.R Bard had previously opposed AngioDynamics' motion to transfer a patent case from the District of Delaware to the District of Utah because, *inter alia*, C.R. Bard's principal place of business was in New Jersey. The Court is not persuaded by Plaintiff's arguments.

First, as indicated above, the decisions in *AngioDynamics* are not controlling in this case. Second, there is no dispute that AngioDynamics is headquartered in Latham, New York, which is within the Northern District of New York. Bard may have believed that a § 1404(a) transfer motion in *AngioDynamics* would not have succeeded and therefore declined to bring it. That does not mean that Bard cannot bring one in this case, which is procedurally far behind *AngioDynamics,* to avoid having its witnesses travel twice to this District. *See Int'l Controls & Measurements Corp. v. Honeywell Int'l, Inc.*, No. 12-cv-1766, 2013 WL 4805801, at *22 (N.D.N.Y. Sept. 9, 2013)(Where two cases will not be consolidated or related, "witnesses could be inconvenienced by having to travel . . . twice, instead of only once, to give their testimony."). Third, Bard points out that BAS was not a party in the District of Delaware patent case, *see generally,* Jan. 12, 2016 Mem. Op., Dkt. No. 27, in *C.R. Bard Inc. v. AngioDynamics, Inc.*, C.A. No. 1:15-cv-00218-SLR (D. Del.

26

July 1, 2015), and argues that the patent case did not involve the Utah-based C.R. Bard employees involved here, meaning that Utah was not more convenient than Delaware.

In consideration of these issues and arguments, the Court gives Plaintiff's choice of forum little weight.

### (2) the convenience of witnesses

"Convenience of the witnesses is generally considered the most important factor in determining the appropriateness of a transfer of venue, and the convenience of non-party witnesses is accorded more weight than that of parties." *Fritz v. Realpage, Inc.*, No. 20-CV-7055-CJS-MJP, 2021 WL 3700434, at *3 (W.D.N.Y. Aug. 20, 2021). "While the convenience of non-party witnesses is accorded more weight than that of party witnesses, neither the number of witnesses nor the fact that a witness is a party, a party-employee, or a nonparty are controlling factors in this analysis." *Andrews*, 914 F. Supp. 2d at 238 (citations omitted). "Rather, the core determination under § 1404(a) is the center of gravity of the litigation, a key test of which is the convenience of witnesses. Courts routinely transfer cases when the principal events occurred, and the principal witnesses are located, in another district." *Id.* (quotation marks, brackets, and citations omitted). Furthermore, "[t]he Court does not merely tally the number of witnesses who reside in the current forum in comparison to the number located in the proposed transferee forum; but rather must qualitatively evaluate the materiality of the testimony that the witnesses may provide." *Fritz*, 2021 WL 3700434, at *3 (quotation marks and citations omitted).

Here, based on its experience in the *AngioDynamics* action, Bard believes that all or nearly all of the party and non-party fact witnesses that it will call reside in Utah. Bard indicates that it has not identified all potential non-party witnesses, but that Kelly

Powers—C.R. Bard's former Senior Vice President of Research and Development and

Staff Vice President for Science and Technology—will certainly be one.  Bard's evidence

indicates that Mr. Powers played a significant role in developing the TLS technology at

issue and in evaluating the efficacy of the PICC technology that Bard allegedly

suppressed. *See* Powers Decl. ¶ 5.  Bard indicates that Mr. Powers served as Bard's

30(b)(6) witness in the *AngioDynamics* action, as the person most knowledgeable on

many of the issues relevant to Bard's PICC and TLS business.  Mr. Powers's declaration

indicates that he lives in Sandy, Utah, and he contends that traveling to this District would

be inconvenient for him. *See* Powers Decl. ¶¶ 7–8.  He also asserts that traveling to Salt

Lake City for pre-trial hearings and trial would be convenient for him. *Id*. ¶ 8.

Bard also contends that "the District of Utah is indisputably more convenient for

Bard's key trial witnesses—the employees whose decisions form the basis of this case."

Dkt. 25-1, at 8 (citing Blaber Decl. ¶¶ 7–8; Burnside Decl. ¶¶ 6–7; Patil Decl. ¶¶ 6–7;

Shepherd Decl. ¶¶ 6–7).  Bard asserts that

> David Blaber, the current Vice President of Sales at Becton Dickinson (the
> parent company of both C. R. Bard and BAS) and a former Senior Vice
> President of Sales and Marketing at C. R. Bard, will testify about the origins
> and development of the TLS Policy; the safety, training, and liability
> considerations underpinning that policy; and customers' preference for
> Bard's PICCs with an integrated, pre-loaded, TLS-compatible stylet, among
> other topics. Blaber Decl. ¶¶ 1, 4(a)–(h).
>
> Ed Burnside, the current Vice President of Engineering at Becton Dickinson
> and a former Vice President of Research and Development at C. R. Bard,
> will testify about the development of and rationale underpinning the TLS
> Policy, including the engineering and safety considerations that led Bard to
> preload its stylets in its PICCs, among other topics. Burnside Decl. ¶¶ 1, 2,
> 3(a)–(e).
>
> Nitin Patil, the current Vice President for Quality Management – Vascular
> Access Devices at Becton Dickinson, and the former Vice President of

28

Engineering/Quality Systems at C. R. Bard, will testify regarding safety issues related to removing and inserting stylets into PICCs, packaging and sterilization issues related to the potential sale of a standalone stylet, and recalls and other safety-related issues with competing PICCs, among other topics. Patil Decl. ¶¶ 1, 2, 3(a)–(d).

Roland Shepherd, a current Senior Product Manager at Becton Dickinson and a former Senior Product Manager at C. R. Bard, will testify to market dynamics relating to PICCs and TLSs; the advantages and disadvantages of competitors' PICCs; customer demand for a standalone stylet; and the marketing of the Bard's TLS, among other topics. Shepherd Decl. ¶¶ 1, 2, 3(a)–(e).

*Id.* at 8-9.

Bard's indicates that these witnesses work at BAS' headquarters at 605 N. 5600 W. in Salt Lake City and live within easy commuting distance (a 13-minute drive) of the U.S. Courthouse at 351 South West Temple Street. *Id.* at 9.   By contrast, Bard contends that if the case were to proceed here, these witnesses would have to travel to Binghamton or Albany, which would entail lengthy flights into local airports, and, if the matter is tried in Binghamton, an additional lengthy drive. *Id.* at 9-10.  This travel time, Bard contends, would be inconvenient and disrupt these witnesses' work and personal lives. *Id.*

Bard's evidence and arguments in this regard weigh heavily in favor of transfer to Salt Lake City, which is clearly the center of gravity of the litigation and where Bard's witnesses who will provide material testimony live and work.

Parrish indicates that fourteen (14) nonparty witnesses from *AngioDynamics* both possess relevant information and reside in this District.  Defendants counter that it is unlikely that a trial in this case will involve that many non-party witnesses, let alone that many associated with a single competitor; that Parrish has proffered no declaration or any other evidence to support its claim that it will call these witnesses; that even

29

AngioDynamics has never suggested that it will bring this many of its own current and former employees to its own trial; and that AngioDynamics contends that because "it is [Bard's] conduct that is at issue in this case . . . discovery from [AngioDynamics] is unlikely to shed light on whether Defendant violated the Sherman Act." Dkt. No. 27 at 9 (citing and quoting Fenlon Aff., Ex. 13 at 2).  Further, Bard asserts that it has deposed eight of these fourteen putative witnesses, and of those eight, at least five resided outside of this District as of the date of their deposition.  *Id.* (citing Moss Aff. ¶ 3; Moss Exs. 1–5.).  Plaintiff's failure to explain the relevance and need for these witnesses provides little to support its opposition to transfer. *See Horanzy*, 87 F. Supp. 3d at 347 (noting that a party seeking consideration of the convenience of witnesses factor must typically "identify key witnesses and the nature of their likely testimony through affidavits," only after which "the materiality, nature, and quality of these witnesses can . . . be considered").

Parrish also contends that two New Jersey-based Bard employees—Simon Campion and John DeFord—"may have . . . made the decision to tie the two products together." Dkt. No. 26 at 19.  Bard counters there is no merit to this speculation, and no evidentiary support for it.  Further, Bard indicates that Mr. Campion and Mr. DeFord "are so peripheral to the issues here that in the *AngioDynamics* action Bard did not even list them as individuals with knowledge about Bard's TLS, its PICCs, or its TLS Policy on its initial disclosures; did not include them among its 30 document custodians; and AngioDynamics did not even seek to depose them." Dkt. No. 27 at 11 (citing Moss Decl. at ¶ 2–4.)  Moreover, Defendants contend, a Utah court could compel the attendance of these party employees as easily as this one could. *Id.*

Plaintiff's reference to these potential witnesses provides little to support its

opposition to transfer.

Parrish also suggests that the putative class might call at trial witnesses from 10 hospitals on a list of approximately 75 that AngioDynamics identified as potential class members in *AngioDynamics*, and contends that "it would be no more convenient for at least eight of them to travel to this District than to travel to Utah." Dkt. No. 26 at 21. The Court is not persuaded by this argument.

The *AngioDynamics* document that Parrish references for this list (Letter Motion from Edward Moss, *AngioDynamics*, Dkt. No. 83 at 2, n.3) references eleven hospitals: Swedish Hospital, Brookwood Baptist Medical Center, Inova Fairfax, Oklahoma University Medical Center, University Hospitals of Cleveland, Akron General Medical Center, Parkview Health, Indiana University Health Facilities, Summerlin Hospital, Christus St. Patrick Hospital, and Beaumont Hospital Dearborn. This document does not indicate where some of these hospitals are located, the names of the putative hospital witnesses, or where each witness resides. Further, as Defendants argue, "there are potentially thousands of putative class member hospitals spread across the United States. Speculation that 10 out of these thousands might testify is not a reasoned basis for selecting this forum. And Parrish fails to rebut Bard's showing this District is less, not more convenient for a nationwide class, in which thousands of hospitals from across the country may be members, whether proceedings occur in Albany or Binghamton." Dkt. No. 27 at 6.

Parrish's conclusory allegations in this regard are insufficient to support a conclusion that this District would be more convenient for prospective hospital witnesses than would be the District of Utah.

Parrish also argues that three AngioDynamics witness gave relevant testimony in

the *AngioDynamics* case and will be called in this action.  These witnesses are Scott

Centea, AngioDynamics' Senior Director of Global Marketing; Chad Campbell,

AngioDynamics' General Manager; and William Millar, AngioDynamics' Regional Manager.

Centea "testified that AngioDynamics' sales representatives 'were being asked daily, if

[AngioDynamics'] BioFlo could be used with Sherlock and 3CG . . . .  When asked whether

he had ever had 'an actual conversation where any of these accounts ever told [him] that

they would rather buy [AngioDynamics'] PICC with Bard's single sterile stylet for more than

Bard's PICC with Bard's Sherlock stylet,' Centea testified that he has 'had so many of

those conversations, they all seem to run together.'" *AngioDynamics, Inc. v. C.R. Bard,*

*Inc.,* No. 1:17-CV-00598 (BKS/CFH), 2021 WL 1792394, *1 (N.D.N.Y. May 5, 2021).

Campbell testified that "the number one reason [AngioDynamics loses business to Bard] is

because customers prefer [Bard's] navigation and tip location' product, and are forced to

use Bard's PICCs in order to gain access to that product." *Id.*  Millar testified that "[most

hospitals in today's world are all budgetary conscious . . . . [T]his particular hospital here . .

. was definitely a hospital that was – had price, obviously through my e-mails here was –

very important to them." *Id.* at *12.  Parrish argues that such testimony relates directly to

Parrish's allegation that "Bard's tying has prevented competitors from selling to a

substantial portion of the PICC market and helps Bard maintain its market power." Compl.

¶ 49.  Bard counters that "Parrish provides no evidence as to where these witnesses

reside, whether they will testify at trial, or whether trial in Utah would be inconvenient for

them, much less why their cumulative testimony is even material to the factual issues

presented by this different class action brought by hospital customers, not a competitor."

Dkt. No. 64 at 9 (citing *Horanzy*, 87 F. Supp. 3d at 347).

The Court agrees with Bard that Parrish fails to provide evidence as to where these witnesses reside,[11] whether they will testify at trial, or whether trial in Utah would be inconvenient for them. Thus, on these basis alone, and assuming without deciding that all of their testimony (that seems cumulative) is material to the factual issues presented in this putative class action brought on behalf of hospital customers, the Court cannot conclude that transfer to the District of Utah would be inconvenient to these witnesses.

For the reasons discussed here, the Court finds that the convenience of the witnesses tips in favor of transfer to the District of Utah.

**(3) the location of relevant documents and relative ease of access to sources of proof**

Notwithstanding the development of secure document-transfer technology, laying venue in the district in which most of the documentary evidence resides can reduce the costs and burdens of litigation. *See Andrews*, 914 F. Supp. 2d at 239 ("Although the location of relevant documents may be of less significance in light of modern copying and reproduction techniques, it nonetheless retains some relevance to the venue inquiry."); *Defenshield Inc. v. First Choice Armor & Equip., Inc*., No. 5:10-cv-1140-GTS-DEP, 2012 WL 1069088, at *12 (N.D.N.Y. Mar. 29, 2012) (noting that "the location of the defendant's documents weighs in favor of venue being laid in that location").  Bard argues that the vast majority of discovery Bard produced in *AngioDynamics* was collected from employees who work at BAS' headquarters in Salt Lake City, and to the extent Bard is required to undertake additional discovery in this

---

[11]The Court notes that Millar was deposed on January 24, 2020 in Auburn, Alabama.  *See* Dkt. 144-38 in *AngioDynamics*.

action, it will in all likelihood collect documents from employees in that same location. Dkt. No. 25-1 at 14 (citing Yodice 06/05/20 Decl. ¶¶ 5–6).

Bard's corporate policies are the principal issue in this action, and Bard has offered detailed, sworn declarations of its relevant witnesses to demonstrate that Utah is "the site of events from which the claim arises." *Travelers Prop. Cas. Co. of Am. v. Ocean Reef Charters LLC*, 324 F. Supp. 3d 366, 374, 379 (W.D.N.Y. 2018). Although Plaintiff is correct that Bard's declarations do not indicate that relevant policy decisions were made exclusively in Utah, and Bard indicates that it "cannot state with absolute certainty that no relevant Bard conduct occurred anywhere but Utah," Dkt. No. 27 at 8, Bard's evidence indicates that the relevant policies originated in Salt Lake City, and that Salt Lake City is the locus of operative facts and witnesses because it is "where the acts or omissions for which Defendants could be held liable occurred." *Crandell v. Ross*, No. 9:17-CV-00755 (BKS/CFH), 2019 WL 3302819, at *5 (N.D.N.Y. July 23, 2019); *see Horanzy*, 87 F. Supp. 3d at 349 ("[C]ourts look to where the events from which the claim arises occurred."). Plaintiff's reference to documents produced by AngioDynamics in this District does not change the calculus because the Court looks to the location of the parties' documents, not that of non-party documents.

In light of modern copying and reproduction technologies, the possibility of offering certified copies of business records at trial, and the fact that Bard has produced seemingly relevant documents in this District, the Court finds that this factor is neutral, tipping in favor of neither District.

### (4) the convenience of the parties

Bard contends that many of the same arguments addressed to the inconvenience

of its witnesses apply to Bard itself.  Bard maintains that

> [t]he witnesses listed above, and other Salt Lake City-based executives and
> employees, will be integral at trial and pre-trial hearings. Bard's business is
> almost certain to be disrupted by the demands that a fact-intensive antitrust
> trial will place on their time, and trying this case in this District—meaning that
> executives would be required to travel and take even more time away from
> their day jobs—would exacerbate that disruption. Blaber Decl. ¶ 6; Burnside
> Decl. ¶ 5; Patil Decl. ¶ 5; Shepherd Decl. ¶ 6.

Dkt. No. 25-1 at 9.

This inconvenience weighs in favor of transfer.  *See Andrews*, 914 F. Supp. 2d at
240 (finding that the convenience-of-the-parties-and-witnesses factor weighed in favor of a
transfer "because of the potential disruption of [defendant's] business posed by the
number of employee-witnesses that would be called upon to testify at trial").

Further, this is a putative nationwide class action with potential class members
strewn across the United States.  From a nationwide class action perspective, Salt Lake
City is more convenient than Binghamton or Albany because it is more centrally located
than Binghamton or Albany, and because Salt Lake City has an international airport
located relatively close nearby.  Moreover,  Parrish has already chosen to file this action
more than 1,200 miles away from its home in Titusville, Florida, and thus seems hard
pressed to complain about the inconvenience of litigating in Salt Lake City.   The
convenience of Parrish's counsel if this matter is transferred is irrelevant to the inquiry.
*See Chicago, R.I. & P.R. Co. v. Igoe*, 220 F.2d 299, 304 (7th Cir. 1955) ("[N]or does §
1404(a) provide that the convenience of counsel is a factor to be considered."); *Island
View Residential Treatment Center v. Kaiser Permanente*, No. 1:09-cv-32, 2009 WL
2614682, *3 (D. Utah August 21, 2009) ("Although § 1404(a) considers the convenience of
the parties and witnesses, it says nothing about the convenience of counsel.").

35

This case has little to no nexus to this District, and Plaintiff appears to have selected it for tactical reasons—not for convenience.  The "convenience of the parties" factor weighs in favor of transferring this case to the District of Utah which is the center of gravity of the litigation.

### (5) the locus of operative facts

"The locus of operative facts is an important factor to be considered in deciding where a case should be tried." *Wilson*, 821 F. Supp.2d at 518.  In making this determination, courts look to where "the events from which the claim arises" occurred. *Id*.

Bard's declarations convincingly establish that BAS' office in Salt Lake City is the locus of operative facts and witnesses because it is "where the acts or omissions for which Defendants could be held liable occurred." *Crandell*, 2019 WL 3302819, at *5.  Indeed, as indicated above, Bard's evidence indicates that its employees: (i) invented, designed, and marketed its PICC and TLS technology and (ii) developed and implemented the TLS Policy at its corporate headquarters in Salt Lake City.  Furthermore, this evidence indicates Bard sells and distributes PICC and TLS technology nationwide from BAS' Salt Lake City headquarters.  This factor weighs heavily in favor of transfer.

### (6) the availability of process to compel the attendance of unwilling witnesses

"Under the Federal Rules of Civil Procedure governing a subpoena requiring attendance of a witness at a hearing or trial, a nonparty witness outside of the state in which the district court presiding over the case sits, and not within 100 miles of the court, may not be compelled to attend a hearing or trial, and the only remedy available to litigants, if a witness will not attend voluntarily, is to take that witness' deposition." *Fritz,*

36

2021 WL 3700434, at *5 (citing Fed. R. Civ. P. 45(d)).  Parrish contends that it does not intend to call nonparty witnesses at trial by videotaped deposition, "at least not with respect to those witnesses who live in this District."  Dkt. No. 26 at 23.  Parrish argues that it would be "unjustly inconvenienced if it was required to litigate this case without live testimony from the nonparty material AngioDynamics witnesses." *Id.*  Bard counters that AngioDynamics witnesses could be compelled to testify in Utah under Federal Rule of Civil Procedure 45(c)(1)(B)(i)-(ii) which empowers a district court to command a person to attend trial if that person "regularly transacts business in person" within the state in which the court sits, and if the person "would not incur substantial expense." Dkt. No. 25-1 at 22. Bard points to the transfer motion in the Delaware patent case in which Chuck Greiner, AngioDynamics' Senior Vice President for Vascular Access, claimed that AngioDynamics had Utah sales of $660,247.  *Id.*

Bard's evidence does not indicate that the particular witnesses Parrish seeks to call at trial regularly transact business in person in Utah or that such witnesses would not incur substantial expense if subpoenaed to testify in the District of Utah. Accordingly, the Court finds that this factor weighs against transfer.

### (7) the relative means of the parties

Plaintiff has adequately established that there is a significant financial disparity between the parties, with Bard's financial resources dwarfing those of Parrish. *See* Dkt. No. 26 at 21. However, the Court finds this factor is neutral.

First, Parrish chose to litigate in a forum far outside its home district, and it cannot credibly argue that it has the means to litigate in one foreign forum but not another. *See, e.g., JTHTax, Inc. v. Lee*, 482 F. Supp 2d 731, 738 (E.D. Va. 2007) ("Status as a

37

corporation with sufficient resources to defend in a foreign forum is not a factor that this court considers in a transfer analysis.").

Second, Parrish seeks to bring a nationwide class action suit.  Some courts that have considered the relative means of the parties in the context of class action suits have found that "the fact that the suit is a class action may diminish the weight that is placed on this factor." *Fritz,* 2021 WL 3700434, at *5 (citing *Jones v. Walgreen Co.*, 463 F. Supp. 2d 267, 278 (D. Conn. 2006); *Wilson v. DirectBuy, Inc.*, 821 F. Supp. 2d 510, 516 (D. Conn. 2011)(deciding that class action lawsuits give this factor less weight and when there is a great disparity, it only slightly tips the balance in favor of a plaintiff's chosen forum)).

Here, although Bard has relatively much greater means than Parrish, the fact that Parrish chose to litigate this matter far from its home and that the case is a putative nationwide class action, the Court finds that this factor is neutral - neither tipping for or against transfer.

### (8)  The Interests of Justice and Judicial Economy

Parrish asserts that contrary to the "typical approach" of filing a transfer motion in the alternative to a dismissal motion, Bard filed a motion for judgment on the pleadings after renewing its transfer motion.  Dkt. No. 58 at 11; *see* Dkt. No. 47 (Motion for Judgment on the Pleadings).  Parrish argues that the interests of justice weigh against transferring this case to the District of Utah because transfer would require the parties to re-brief the case under the applicable Tenth Circuit law, which would "add continued delay to the resolution of this dispute and additional expense to the Parties," and would delay resolution of the pending motion to dismiss. Dkt. No. 58 at 12.  Parrish also argues that "the dismissal motion will require the Court to familiarize itself even further with this

38

case and the law that should apply to it," and that "[t]his investment of judicial resources plainly counsels against a transfer that would require the District of Utah to exercise the very same judicial resources to understand the relevant allegations and applicable law." *Id.* at 11-12.  Parrish contends that "the forgoing facts present an unwise and redundant use of judicial resources (including because the dismissal motion of course may moot the transfer motion)." *Id.* at 12.

As Parrish recognizes, transfer motions are often filed in the alternative to motions to dismiss.  "Where district courts are presented with both a motion to dismiss . . .  and a motion to transfer venue . . .,  they commonly address the venue motion first, and, where transfer is appropriate, leave the motion to dismiss to be decided by the transferee court." *Hart v. Crab Addison, Inc.*, No. 13-CV-6458 CJS, 2014 WL 2865899, at *2 (W.D.N.Y. June 24, 2014)(citing *Hafstad v. Hornick*, Civ. A. No. 86–2811, 1987 WL 10871 at *3 (D.D.C. May 6, 1987)("[I]t is fitting to leave all decisions on the merits to [the transferee] court, rather than to tie that court's hands with substantive decisions made in this jurisdiction."); *Brown v. New York*, 947 F.Supp.2d 317, 326 (E.D. N.Y. 2013) ("As the Court finds that transfer is appropriate, it defers decision on the Defendants' motion to dismiss for failure to state a claim to allow the transferee court an opportunity to consider the merits of the case."); *Lyon v. Cornell University*, No. 97 Civ. 7070 (JGK), 1998 WL 226193 at *2 (S.D.N.Y. May 4, 1998) ("It is appropriate for the transferee court to consider the merits of a motion for summary judgment. That Court should decide the critical issues on that motion, including whether there are any disputed issues of material fact. The defendant's motion is critical to the disposition of this case. The transferee court in the Northern District should rule on the motion in the first instance.")(citations omitted)).

Although Defendants did not file their dismissal motion in the alternative to their transfer motion, the Court has before it both motions, a functionally equivalent posture to filing the two motions in the alternative.  Under these circumstances, the Court first addresses the motion to transfer. *See Hart*, 2014 WL 2865899, at *2.  In doing so, and if the transfer motion is granted, the Court will have no reason to substantively analyze the dismissal motion.  *See id.*  Thus, when a case is transferred, there is no "redundant use of judicial resources" occasioned by the transfer.  Furthermore, when motions to transfer and to dismiss are brought in the alternative, parties do not brief only the transfer motion. Although transfer will cause the parties to re-brief the issues raised in the dismissal motion under Tenth Circuit law, that would have resulted if Defendants had brought their motions in the alternative and the transfer motion were granted.  *See Hart*, 2014 WL 2865899, at *2.  Given that only federal claims are raised in this action, the task of re-briefing the issues does not appear onerous. The Court finds no undue burden on the Plaintiff for having to re-brief the dismissal motion under Tenth Circuit law if the transfer motion is granted.

 A transfer will cause some delay in resolving the dismissal motion, and, if not resolved in Defendants' favor, some delay in resolving the disputes in issue.  However, some delay is expected in any case that is transferred, and while that delay is somewhat increased here because the initial transfer motion was denied with leave to renew, the Court does not find that any expected delay will be so long as to justifying denying transfer on this basis alone.

The Court finds that concerns for judicial economy do not weigh against transfer, but that the interests of justice caused by delay in the resolution of this case weighs slightly

40

against transfer.

## III.   CONCLUSION

Having considered the interests of justice and judicial economy, and having weighed the relevant factors under Section 1404(a), the Court concludes that Defendants have established by clear and convincing evidence that the balance of convenience and justice favors transferring this action in the District of Utah and outweighs any prejudice that transfer may impose upon Plaintiff.  Accordingly, the Court **GRANTS** Defendants' Renewed Motion to Transfer to the United States District Court for the District of Utah, Dkt. No. 34, and this matter is **TRANSFERRED** to the United States District Court for the District of Utah.   Defendants' Motion to Stay Discovery, Dkt. No. 56, is **DENIED as moot**. Defendants' Motion for Judgment on the Pleadings, Dkt. No. 47, and Plaintiff's Motion for Class Certification, Dkt. No. 85, will be decided by the United States District Court for the District of Utah.

**IT IS SO ORDERED.**

Dated: February 15, 2022

Thomas J. McAvoy
Senior, U.S. District Judge

41